UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:22-CV-00228-GNS-RSE

BUILD 4 IMPACT, INC.                                           PLAINTIFF

v.

PANTHER II TRANSPORTATION, INC.                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion for Partial Summary Judgment by Plaintiff Build 4 Impact, Inc. ("Build") (DN 37), and a Motion for an Extension of Time (DN 40), and Motion for Summary Judgment (DN 53) on behalf of Defendant Panther II Transportation, Inc. ("Panther").[1] The motions are ripe for adjudication.

### I.      BACKGROUND

In 2019, nonparties Sunteck/TTS Inc. ("TTS") and ArcBest II, Inc. ("ArcBest") entered into a Ground Expedite Rate Agreement (the "Agreement") that included a provision limiting the liability of ArcBest or its service providers. (Motter Aff. Ex. 1, at 1, DN 43-2 [hereinafter Agreement]).

Build constructs exhibits and loans them out for display in museums. (*See* Cleveland Dep. 22:23-24:18, Nov. 15, 2023, DN 53-3). In early 2021, Build and the Arizona Science

---

[1] Panther moved to defer the ruling on Build's partial summary judgment or in the alternative for an extension of time to respond, arguing that Build's motion was premature. (Def.'s Mot. Extension Time 3-4, DN 40). Later, after an opportunity to conduct discovery, Panther moved for summary judgment, addressing the same issues raised in Build's motion. (*See* Def.'s Mem. Supp. Mot. Summ. J., DN 53-1; Pl.'s Mem. Supp. Mot. Partial Summ. J., DN 37-1). Given the overlapping subject matter of the motions, Panther has had an adequate opportunity to address these issues, and no extension of time or amended response to Build's motion for summary judgment appears to be necessary.

Center agreed for Build to loan its "Science of Arachnids" exhibit (the "Exhibit") to the Arizona Science Center from May 28, 2021, to January 2, 2022. (Cleveland Dep. 48:3-17; Def.'s Mot. Summ. J. Ex. 2 (PageID # 519-528), DN 53-3). Build contacted TTS, a freight broker it had used since 2016, to arrange transportation of the Exhibit from a storage facility in Kentucky to the Arizona Science Center. (*See* Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 1, DN 43-4; Cleveland Dep. 57:14-22). TTS requested a rate from ArcBest for "20 Pallets 20,000 lbs" and ArcBest responded with a rate of $8100.00. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 1-2). ArcBest selected Panther as the service provider for the shipment. (*See* Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 7).

The Exhibit was initially stored in Texas, where some of it was wrapped in dark-colored shipping blankets, some was packed into shipping containers, and certain foam boulders were left completely unwrapped. (*See* Cleveland Dep. 82:5-85:2). The Exhibit remained wrapped throughout the time it was in storage and as it was loaded into Panther's trailer in Kentucky for transport to Arizona. (Cleveland Dep. 80:7-21, 87:19-25). A bill of lading was issued containing only the word "Displays" in the section titled "Commodity Description." (Compl. Ex. 1, at 1, DN 1-1).

In transit to Arizona, Panther's trailer broke down, and the Exhibit was transferred to a trailer operated by nonparty Maybach International Group, which completed the shipment. (Pl.'s Mot. Partial Summ. J. Ex. 1 (PageID # 96), DN 37). Build alleges that Panther and Maybach improperly transferred the Exhibit, which was damaged upon delivery in Arizona, and had to undergo repairs before it could be displayed at the Arizona Science Center. (*See* Cleveland Dep. 89:4-14; Pl.'s Mot. Partial Summ. J. Ex. 3 (PageID # 106), DN 37; Cleveland Decl. ¶ 9, DN 37).

The Exhibit was displayed at the Arizona Science Center for the full duration and Build received full payment for the Exhibit. (Cleveland Dep. 48:12-50:3).

Build filed this lawsuit, asserting a claim under 49 U.S.C. § 14706, which is known as the Carmack Amendment, for carrier liability. (Compl. ¶¶ 21-25, DN 1).

## II.     JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because a federal question is presented.

## III.     STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support

of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

"The Carmack Amendment is a federal statute that governs liability for damages to goods 'transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading[.]'" *EMCO Corp. v. Miller Transfer & Rigging Co.*, No. 22-3376, 2023 WL 1305110, at *2 (6th Cir. Jan. 31, 2023) (alteration in original) (quoting 49 U.S.C. § 14706(a)(1)). "The Amendment 'makes a motor carrier fully liable for damage to its cargo unless the shipper has agreed to some limitation[]' . . . [by] 'reliev[ing] shippers of the burden of determining which carrier caused the loss as well as the burden of proving negligence.'" *Id.* (internal citation omitted) (quoting *Exel, Inc. v. S. Refrigerated Transp., Inc. (Exel I)*, 807 F.3d 140, 148 (6th Cir. 2015)).

Claims under the Carmack Amendment are resolved under a burden shifting framework where the plaintiff carries the initial burden of establishing a prima facie case demonstrating: "(1) delivery to the carrier in good condition, (2) arrival in damaged condition, and (3) the amount of damages owed." *Id.* (citing *Mo. Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964)). If the plaintiff establishes a prima facie case:

> [T]he burden shifts to the defendant-carrier to show both that it was not negligent and that the damage was instead due to one of five excepted causes: (1) an act of God; (2) an act of terrorism or war; (3) an act of the shipper itself; (4) an act of public authority; or (5) the inherent vice or nature of the goods.

*CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339, 353 (6th Cir. 2014) (citing *Mo. Pac. R.R. Co*, 377 U.S. at 137-38). "If the defendant-carrier meets this burden, it wins. If not, then the shipper prevails based on its establishing the—very low threshold—prima facie case." *Id.*

4

Build moves for summary judgment as to the first two elements of its prima facie case, and Panther argues that Build has insufficient evidence to establish a prima facie claim. (Pl.'s Mem. Supp. Mot. Partial Summ. J. 9; Def.'s Resp. Pl.'s Mot. Partial Summ. J. 10-15, DN 43; Def.'s Mem. Supp. Mot. Summ. J 7-9, 19-22). The parties both move for summary judgment on whether Panther's liability is limited by the Agreement. (Pl.'s Mem. Supp. Mot. Partial Summ. J. 9-12; Def.'s Mem. Supp. Mot. Summ. J. 9-10). Panther also moves for summary judgment on Build's claim for consequential damages. (Def.'s Mem. Supp. Mot. Summ. J. 16-19).

### A. **Build's Prima Facie Case**

#### 1. *Received in Good Condition*

The parties dispute whether the Exhibit was in good condition when Panther received it. Panther argues that Build has failed to establish that the Exhibit was in good condition when Build supplied it to Panther. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. 10-13; Def.'s Reply Mot. Summ. J. 2-4, DN 64). Panther contends that Build cannot establish that the Exhibit was in good condition because it was wrapped in early March of 2021, and stored for two months before being loaded onto Panther's trailer while still wrapped. (Def.'s Reply Mot. Summ. J. 2).

While a clean bill of lading usually satisfies this element of a shipper's prima facie case, that is only where a carrier has the opportunity to inspect the goods before shipment. *See, e.g.*, *Hoover Motor Express Co. v. United States*, 262 F.2d 832 (6th Cir. 1959) ("[T]he statement in the bill of lading as to 'apparent good order' was prima facie evidence only that, as to parts which were open to inspection and visible, the goods were in good order at the point of origin."); *A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997 (11th Cir. 2003) ("Where goods are shipped under seal, the condition of the goods cannot be within the carrier's knowledge. A bill of lading accordingly can attest only to apparent or external good condition,

5

and . . . the shipper may reasonably be required to present some additional evidence of the condition of the goods at the time of delivery." (quoting *Pillsbury Co. v. Ill. Cent. Gulf R.R.*, 687 F.2d 241, 244 (8th Cir. 1982))). Build does not attempt to argue that Panther had an opportunity to inspect the Exhibit prior to shipping but contends that it has provided sufficient proof of the Exhibit's good condition to satisfy this element of its prima facie case. (Pl.'s Resp. Def.'s Mot. Summ. J. 9, DN 63; Pl.'s Reply Mot. Partial Summ. J. 7, DN 44).

Panther compares Build's claim to other cases premised on damage to wrapped goods. (*See* Def.'s Resp. Pl.'s Mot. Partial Summ. J. 11-13). Panther cites to *Ohio Star Transportation LLC v. Roadway Express, Inc.*, No. 2:09-CV-00261, 2010 WL 3666982 (S.D. Ohio Sept. 14, 2010), where a sister court found a shipper had failed to establish a that the carrier received its shipment in good condition because it only provided a clean bill of lading and an affidavit that discussed the post-delivery condition of the goods. *Id.* at *3. *Ohio Star* is clearly distinguishable from this case because Build's representative Richard Cleveland ("Cleveland") testified to the condition of the Exhibit before it was packed in Texas and testified that the Exhibit, although still wrapped in cloth and shrink wrap, was in the same condition when it was loaded onto Panther's truck. (*See* Cleveland Dep. 80:16-24, 147:23-148:25). Further, Cleveland stated that the Exhibit had never been damaged before during transport. (Cleveland Dep. 43:25-44:3). Panther's citation to *Northrich Co. v. Group Transportation Services, Inc.*, No. 1:13-CV-1161, 2015 WL 1291447 (N.D. Ohio Mar. 23, 2015), is unavailing for the same reasons. *Id.* at *5-6.

*Ohio Star* and *Northrich Co.* do not stand for the proposition that carrier must have inspected goods for a shipper to establish a prima facie case of good condition, but that a shipper must provide more than simply a clean bill of lading if a carrier did not have an opportunity to inspect the goods. *See Ohio Star*, 2010 WL 3666982, at *3; *Northrich Co.*, 2015 WL 1291447,

6

at *5-6. Build has done so. Panther has produced no evidence of any intervening incident which could allow a reasonable juror to conclude that the Exhibit pieces, which Cleveland testified were in the same good condition when they were wrapped in Texas as when they were when loaded into Panther's truck, suffered some change of condition. Furthermore, parts of the Exhibit that suffered damage, replica boulders, were not wrapped when loaded into Panther's truck. (Cleveland Dep. 42:23-43:4). All of this, in addition to the clean bill of lading, is enough to meet the "very low threshold" required to establish this element of Build's prima facie case. *See CNA Ins.*, 747 F.3d at 353.

### 2. *Arrival in Damaged Condition*

Panther argues that Build has failed to supply sufficient evidence of the Exhibit's condition when it arrived in Arizona to establish this element of its prima facie case. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. 13-15). Panther bases its argument on the fact that Cleveland was not there when the Exhibit was unloaded from Panther's truck and therefore lacks personal knowledge of any damage to the Exhibit. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. 14). Build supplied the bill of lading, which lists several damaged components of the Exhibit, signed and dated by an individual purported to be the truck driver who delivered the package. (*See* Pl.'s Mot. Partial Summ. J. Ex. 3 (PageID # 106), DN 37; Pl.'s Reply Mot. Partial Summ. J. 7). Further, Cleveland discussed the damages to the Exhibit in his deposition. (*See* Cleveland Dep. 137:8-146:16). Build has raised sufficient evidence to establish this element of its prima facie case, and Panther has failed to raise any evidence other than suggesting "metaphysical doubt" as to Build's proof. *Matsushita Elec. Indus.*, 475 U.S. at 586.

### 3. *Actual Loss*

Panther argues that Build has failed to establish the amount of its actual loss incurred from any alleged damage to the Exhibit. (Def.'s Mem. Supp. Mot. Summ. J. 7-9). Generally, "actual loss" is calculated as "the difference between the market value of the goods at destination if timely delivered without damages and the market value of the goods as actually delivered." *CSX Transp., Inc. v. Meserole St. Recycling*, 618 F. Supp. 2d 753 (W.D. Mich. 2009) (citing *Jessica Howard Ltd. v. Norfolk S. R.R. Co.*, 316 F.3d 165, 168 (2d Cir. 2003)). This general rule, however, "has little bearing on any individual case because how the shipper's loss should be measured depends on the circumstances." *Exel, Inc. v. S. Refrigerated Transp. (Exel II)*, 905 F.3d 455, 465 (6th Cir. 2018) (citations omitted); *Ill. Cent. R. Co. v. Crail*, 281 U.S. 57, 64 (1930) ("The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable." (citations omitted)).

Panther asserts that because Cleveland admitted that a market exists for goods like the Exhibit, any alleged damages would need to be measured by difference in market value. (Def.'s Mem. Supp. Mot. Summ. J. 7-9). Build responds that repair or replacement cost is the appropriate measure of damages. (Pl.'s Resp. Def.'s Mot. Summ. J. 10-11).

Much of the case law discussing the proper measure of damages is inapplicable to the facts of this case because the typical Carmack Amendment case involves goods being transported for sale, while this case involves a museum exhibit that Build was in the business of loaning. (*See* Cleveland Dep. 24:2-11). For example, the Sixth Circuit noted that "several courts have 'held that the burden of proving that the market value rule will not result in a just measure of actual damage is on the carrier.'" *Exel II*, 905 F.3d at 465 (quoting *Great Atl. & Pac. Tea Co.*

8

*v. Atchison, T. & S. F. Ry. Co.*, 333 F.2d 705, 708 (7th Cir. 1964)). This is because "mere replacement costs deprive a manufacturer of expected profit which he is on the verge of earning and do not compensate him for what he 'would have had if the contract [of delivery] had been performed . . . .'" *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 351 (1st Cir. 1973) (alteration in original) (quoting *Chi., M. & St. P. Ry. Co. v. McCaull-Dinsmore Co.*, 253 U.S. 97, 100 (1920)). Here, it would be inappropriate to place the burden of justifying deviation from the market value rule on the carrier, Panther, which is arguing for application of that rule, and it would be equally improper to require that Build's "actual loss" be calculated in terms of the market value of an object that Build was in the business of lending.

Panther insists market value must be used because the Exhibit has a market value and because Build did not act immediately to replace the Exhibit. (Def.'s Mem. Supp. Mot. Summ. J. 7-9). Panther cites *Project Hope v. M/V IBN SINA*, 250 F.3d 67 (2d Cir. 2001), in support of the assertion that "[r]eplacement cost can be a measure of damages if there is no market value for the damaged goods." (Def.'s Mem. Supp. Mot. Summ. J. 7 (citing *Project Hope*, 250 F.3d at 77)). A review of *Project Hope* makes clear that the Second Circuit found that lack of market value was *sufficient* to justify departure from the market value rule but makes no holding that lack of a market value is *necessary* to do so. *See Project Hope*, 250 F.3d at 77 ("While it is true that damages under the Carmack Amendment should generally be based on the fair market value, we have held that it need not be applied if 'circumstances suggest a more appropriate alternative.'" (internal citation omitted) (citation omitted)). Accordingly, Cleveland's admission that a marketplace exists for museum exhibits does not render market value the only appropriate measure of damages.

9

Panther's next contested point appears to rely on a sentence in *Exel II* where the Sixth Circuit noted, "courts have recognized that '[r]eplacement cost is an appropriate measure of damages where the injured party could mitigate the loss by replacing the goods.'" *Exel II*, 905 F.3d at 465 (alteration in original) (citation omitted). Again, the difference in context renders this idea largely inapplicable here. In *Exel II*, the carrier successfully argued that replacement cost was the appropriate measure of damages because the shipper did not lose any sales as a result of a stolen shipment. *See id.* at 465-66. In the context of the transportation of goods for sale, a prompt replacement that results in no loss in sales obviates the need for market value rule because no loss in sales means no loss in profits. *See, e.g.*, *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir. 1991) (applying the market value rule because the plaintiff-shipper "produced evidence that it sells virtually all of its sensitized photographic merchandise shortly after production is completed. This evidence tends to show that any damaged merchandise that could not be sold would result in lost profits."). Requiring Build to calculate its damages based on the market value of a one-of-a-kind item that it never intended to sell would be a perverse interpretation of "actual loss." Thus, the appropriate measure of damages in this instance is the lesser of the repair or replacement cost of the Exhibit, and Panther's motion for summary judgment is denied as to this issue.

For the foregoing reasons, Build has satisfied the first two elements of its prima facie case are satisfied. Panther's motion is denied to this extent. An issue of fact remains as to Build's actual loss, which will be calculated as the cost to repair the damage caused during transit or to replace the Exhibit.[2]

---

[2] If a trier of fact finds that Build has proven its actual loss at trial, Panther may still rebut Build's prima facie case by proving that it was not negligent and that the damage was due to one

B.     **Limitation on Liability**

Panther also argues that, regardless of whether Build has established its prima facie case, Panther's liability for any damage incurred is limited by ArcBest's Tariff, Bill of Lading, and Agreement. (Def.'s Mem. Supp. Mot. Summ. J. 10-16).

"[T]he 'default posture' of the Carmack Amendment is full liability on the carrier." *Exel I*, 807 F.3d at 150 (citation omitted). The procedure by which a carrier may limit its liability is contained in 49 U.S.C. § 14706(c)(1), and courts have interpreted this section to require a carrier to:

> (1) maintain approved tariff rates with the ICC; (2) provide the shipper with a fair opportunity to choose between two or more levels of liability; (3) obtain the shipper's written agreement as to its choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.

*Exel I*, 807 F.3d at 151 (citations omitted). A carrier has the burden of establishing its limitation of liability. *Id.* (citation omitted)

The most hotly contested issue in this case is whether Build may be bound to the liability limitation provision in a contract between its broker, TTS, and Panther's owner, ArcBest. Build points to the Sixth Circuit's discussion in *Exel I*, where the court declined to enforce a contract between a broker and carrier against a shipper because the Agreement "was not executed by the shipper . . . and the carrier . . . ." *Exel I*, 807 F.3d at 151 (citation omitted). There, the broker and carrier had entered into a Master Transportation Services Agreement (MTSA) nearly a year before the shipper contracted with the broker to ship the goods at issue. *See Exel I*, 807 F.3d at 143. Likewise, here, the Agreement between TTS and ArcBest was executed in 2019, almost two years before Build requested a quote to ship the Exhibit to Arizona. (*See* Agreement 1;

---

of the five excepted causes. *See CNA Ins.*, 747 F.3d at 353 (citing *Mo. Pac. R.R. Co.*, 377 U.S. at 137-38)

Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 1). While there are certainly distinctions between *Exel* and the instant case, the Sixth Circuit's statement here is quite clear: "[A]n agreement between a carrier and broker that does not establish the shipper's assent cannot set the carrier's liability . . . ." *Exel I*, 807 F.3d 150-51.[3]

The email communications between Build and TTS and between TTS and ArcBest show that ArcBest merely sent a flat rate quote of $8100.00 for the trip from Kentucky to Arizona. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 1). There was no mention of any liability limitation, nor the option for another rate. *See Exel II*, 905 F.3d at 462 ("In fact, the very purpose of the requirement that the carrier provide the shipper with a choice between levels of liability is to allow the shipper to 'obtain[] the lower of two or more rates of charges proportioned to the amount of the risk.'" (alteration in original) (quoting *Adams Express Co. v. Croninger*, 226 U.S. 491, 509-10 (1913))). Panther has failed to point to any evidence establishing that Build assented to any liability limitation, and therefore ArcBest's Agreement with TTS is insufficient to limit Build's liability.

Panther also points to the value declared box on the bill of lading as evidence that Build was given the choice between two or more liability options. (Def.'s Mem. Supp. Mot. Summ. J. 15-16). This argument was squarely rejected by the Sixth Circuit in *Exel I*. *See Exel I*, 807 F.3d at 152-53. The value declared box on the bill of lading in this case stated that "[w]here the rate is dependent on value, the shipper shall state specifically in writing the agreed or declared value of the property . . . ." (Compl. Ex. 1, at 1). Like in *Exel I*, notwithstanding the value declared

---

[3] Panther cites to *Werner Enterprises, Inc. v. Westwind Maritime International, Inc.*, 554 F.3d 1319 (11th Cir. 2009), where the Eleventh Circuit, in similar circumstances, relied on Supreme Court precedent outside the context of the Carmack Amendment and enforced the liability limitation against the shipper. *See id.* at 1323-26. Certainly, application of *Werner* would appear to lead to a different result here. Nonetheless, this Court is bound by Sixth Circuit precedent.

box, the bill of lading "[did] not offer an option to choose a higher level of coverage or state that the carrier's liability might be limited." *Exel I*, 807 F.3d at 152-53. Further, by the plain language of the value declared box, Build was not required to state the value because it was paying a flat rate. (*See* Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 7).

"[O]nly by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." *Exel II*, 905 F.3d at 462 (quoting *N.Y., N.H. & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 135 (1953)). There is insufficient evidence from which a reasonable juror could conclude that Build had the opportunity to choose between two or more levels of liability. Accordingly, Build is entitled to judgment as a matter of law on this issue.

### C. Consequential Damages

Panther argues that Build's claim for consequential damages must be dismissed because Build's consequential damages were not foreseeable. (Def.'s Mem. Supp. Mot. Summ. J. 16-19).

Special or consequential damages are available under the Carmack Amendment, but the shipper bears the burden of proving that the carrier "'had reasonable notice or knowledge of the special conditions rendering such damages the natural and probable result of the breach' in order to recover special or consequential damages." *Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp. 2d 495 (N.D. Ohio 2009) (quoting *Marquette Cement Mfg. Co. v. Louisville & N. R. Co.*, 281 F. Supp. 944 (E.D. Tenn. 1967), *aff'd*, 406 F.2d 731 (6th Cir. 1969)); *see also Am. Synthetic Rubber Corp. v. Louisville & N. R. Co.*, 422 F.2d 462, 467 (6th Cir. 1970) (noting that *Marquette* stated the correct standard for recovery of special or consequential damages). The

shipper must show notice or knowledge existed at the time that the carrier agreed to ship the cargo. *Custom Rubber*, 633 F. Supp. 2d at 516.

In its Fourth Supplemental Disclosures, Build identified the consequential damages it seeks to recover, totaling $357,119.53 in wasted marketing expenses, storage, "husbandry fees to care for the arachnid collection," feed and supplies for the arachnid collection, utility bills for the arachnid collection, and loss of revenue. (Def.'s Mot. Summ. J. Ex. 1, at 1-2, DN 53-2). Build argues that Panther should have inferred that lost profits and consequential damages would result from damage to the Exhibit because Panther knew that Build's cargo was being delivered to a museum, involved unique items, and required specialized loading and securement techniques, citing Panther's response to Build's first set of interrogatories. (Pl.'s Resp. Def.'s Mot. Summ. J. 20). As an initial matter, Build, who bears the burden of proof for this claim, provides no authority supporting the proposition that a carrier can be imputed with knowledge of potential consequential damages based on a shipment's destination or methods used to pack it. Further, that Panther responded to an interrogatory describing the Exhibit as unique and discussing the specialized loading procedures does not show Panther's knowledge at the time that Panther agreed to ship the cargo. (*See* Pl.'s Mot. Partial Summ. J. Ex. 1 (PageID # 94), DN 37). TTS's email requesting a quote from ArcBest merely lists the size, weight, starting point, and destination of the cargo. (*See* Def.'s Resp. Pl.'s Mot. Partial Summ. J. Ex. B, at 1-2). The bill of lading likewise contains no specialized information about the cargo other than the description "Displays." (Compl. Ex. 1, at 1). Build has provided no evidence that Panther was aware when it agreed to ship the Exhibit that damage to the cargo could result in any of the special and

14

consequential damages it seeks.[4]  Accordingly, Panther's motion for summary judgment is granted as to Build's claim for consequential damages.  *See Dubow Textile, Inc. v. W. Specialized, Inc.*, No. CV 18-2963 (DWF/LIB), 2021 WL 5505447, at *5 (D. Minn. Nov. 24, 2021) (declining to award damages for lost profits resulting from damages to a printer because the shipper "was not informed of the Printer's value, nor was it informed prior to its acceptance of the Printer's shipment that its acceptance included potential liability for Dubow's lost profits associated with any period of time that Dubow would not have an additional printer at its facility should the Printer be damaged and not useable.").

### D.      Attorney's Fees

Panther also moves for summary judgment on Build's claim for attorney's fees.  (Def.'s Mem. Supp. Mot. Summ. J. 19).  Build "concedes case law supports the proposition that attorney's fees are not recoverable as of right under a Carmack claim," but maintains, without elaboration, that "[a]ttorney's fees would also be recoverable, if warranted, under [Fed. R. Civ. P.] 11."  (Pl.'s Resp. Def.'s Mot. Summ. J. 22).  Build has not demonstrated that it has any colorable basis for recovery of attorney's fees.  Accordingly, summary judgment is granted to Panther as to Build's claim for attorney's fees.

### V.      CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Plaintiff's Motion for Partial Summary Judgment (DN 37) is **GRANTED**.

2.    Defendant's Motion to Defer Ruling on Plaintiff's Motion for Summary Judgment or for an Extension of Time (DN 40) is **DENIED**.

---

[4] The Exhibit was displayed as scheduled at the Arizona Science Center, and Build received full payment for loaning the Exhibit.  (Cleveland Dep. 48:12-50:3).  Build's claim for consequential damages relates to damages allegedly incurred after the Exhibit was removed from the Arizona Science Center.

3. Defendant's Motion for Summary Judgment (DN 53) is **GRANTED IN PART**, and Plaintiff's requests for consequential damages and attorney's fees are dismissed.

Greg N. Stivers, Chief Judge
United States District Court

August 29, 2024

cc: counsel of record